Thank you, Your Honor. This appeal involves a recusal issue, and again, I would ask the Court to keep the facts of the recusal matter in its mind as it analyzes and determines the underlying case, the suit we brought against Accenta. The Court originally allowed part of our claim against Accenta to stand. The claim for tortious interference with prospective economic advantage, it was going to remand that to the State Court. It was going to be allowed to pursue it. Around the time that it made this tentative ruling, there were several ex parte contacts between counsel for Accenta and the Bankruptcy Court, and then the Court reversed its ruling, found essential. I'm not a fan of ex parte communications. Published opinion in Interim Edicts makes clear, but there's nothing here to suggest that the communications had any content that was going to come out. Clearly, it had already been made. It just isn't anything to suggest that there was anything untoward. So how can both Courts review their respective discretions? Well, I think in deciding a recusal motion, the standard, it's a recusal is appropriate where a reasonable person with knowledge of all the facts, and we don't know all the facts. We know what they say happened in the conversations, but the Bankruptcy Court specifically refused to allow me to find out if, in fact, that was all that was said. We don't know all the facts. Well, the Bankruptcy Judge was on the other end, or his staff, so the Bankruptcy Judge clearly knew what he said. He said there wasn't anything. It was just scheduling nonsense. Well, of course he'd say that. Well, I mean, what do you want to do, depose the judge? No, but if we could talk to his law clerks, who may have received some of the income. Well, that's no different. I mean, the law clerk's the same as the judge. So you want to talk to the, you wanted to depose the law clerk in the middle of the litigation? Well... I mean, I just don't know what you wanted to do. We didn't want to do anything after the first reversal, after he reversed himself on the trustee's motion. Well, you know, reversal, a tentative ruling is just that. It's a ruling intended to assist counsel in preparing for oral argument and to hone in on the issues that matter to the case. And it's changed all the time. It's the reason it's tentative instead of final. And there's no significance to it, I can assure you. I mean, you just change your mind, because argument makes you change your mind, or you rethought it and something occurred to you. But these were changed before any argument occurred, and they were changed on dispositive motions, and they were changed... But so what? I mean, the tentative ruling is a favor. It's not a final order. No, it isn't. And if it had only happened once, we wouldn't have brought the motion to recuse. But it happened twice, and it was on dispositive motions that were tentatively made. I couldn't track through exactly. I mean, wasn't the effect of the change only with respect to the remanded state claim? That was the only claim that survived. So that it could be remanded? I mean, to clarify who was and wasn't a party on the remanded claim? No. He was going to allow the remanded claim to live. It was a state claim for tortious interference... Yes. ...that had been removed to the bankruptcy court, and he was going to remand it and let us pursue it in the state court. There was a similar claim... Which happened, didn't it? Or did it? No. No. He reversed himself. And with what consequence? He dismissed the – he didn't remand it. He just dismissed it. His tentative ruling was to allow part of our claim to survive in the state court, and we could pursue it, tortious interference against Exentia and Ernaton. Yeah. But after he made that tentative ruling, there was an ex-party contact, and then he came back and said, I'm not going to allow it to survive. I'm going to dismiss it. Now, which ex-party contact are you talking about? Which date? It was the – by Mr. Dahlberg to the court. There was a hearing on December 17... Mm-hmm. ...where he said, I'm going to affirm my tentative. I'm going to allow the state claim for tortious interference to survive. It's going to be remanded. The similar claim that had been brought in the trustee's case, he was just going to hold, let us litigate in the state court, and then that would impact the state – or the tortious interference claim that he was holding in the bankruptcy court. After that – well, Mr. Dahlberg pleaded with him to take another look, and he'll – he'll look. And he said, on the record, I agree. He said, okay, I will. I'm not going to make it final until I've looked at everything again. He did. He said, I'll take another look at it. He did. We walk out. Next day, Mr. Dahlberg calls the chambers. Doesn't talk to the judge. You're talking about the December 18th? December 18th. Where he said he was sick? He said he was sick and that he wouldn't be able to get the ruling in because he was sick. But he had seven days to get the ruling in. He didn't have to call the court the next day. Well, I mean, what are we – what are you supposed to infer about a telephone call saying that – that he was going to be late in submitting a proposed order? He wasn't going to be late. He had seven days to submit it. He called the day after. He had seven days from the 17th. He wasn't sick either. I don't know. The point is, when he – if the conversation were about his being sick and going to be late or not late in submitting an order, what does that have to do with the price of eggs? Well, there was – first of all, there's no reason to call. Okay. You have seven days. If you're not going to get it on the seventh day, then you call on the sixth day and say, I'm sick. I can't get it in. There's no reason to call the day after. Plus, he'd seen what happened with the trustees' case. You get a bad tentative, call the judge, it's reversed. Gets a bad tentative, call the judge, gets reversed. You know, I don't know what he said. I know what happened. I don't know what he said to the judge. I'd like to find out, but I know this court and the district court don't know what he said to the judge. They know what he says he said to the judge, but we don't know what he said. And the standard on recusal is with knowledge of all the facts, and we don't have all the facts. And we're not asking – I'm sorry. I was going to say, counsel, I – both my colleagues have been district court judges. I have not. But I'm very disturbed by what you're saying here, because although you're not coming right out and saying it, you're in effect accusing this judge of participating in a fraudulent act. He was somehow bribed or coerced or something like that. I certainly agree that it's improper, except under unusual circumstances, to have ex parte communications, and perhaps this judge or his law clerk was not careful in that. But there is nothing in this record that suggests that there's anything other than  that the judge said that. So what we have to do, if we follow your line, is basically you're going to have to depose the judge. And can you imagine what that would do to our legal system if anybody that didn't like the way a tentative ruling turned out and found out that somebody made an ex parte contact of the clerk could then depose the judge if they didn't like the ruling? It would create chaos. Well – Right? Well – Isn't that what would happen? Not necessarily. Would it be good for the system? If you've got judges reversing tentative rulings on dispositive motions twice after being contacted ex parte by the losing party on those motions, it would be a good thing to have those judges depose, because I don't think they'd do it. They would stop with the ex parte contact. So really what you want to do is do away with tentative decisions? No. No, because you're suggesting that if you make a tentative decision and then change your mind, there's something – and you happen to have some kind of procedural communication with the party in between – that there's something very suspicious about that. I'd like to do away with ex parte contacts. I never – Suppose we decide that we think he was right. Suppose we decide that, you under the law, and the tentative one would have been wrong. Would it be – Is that clearer? No. I don't think so. So then it's like strict liability. No. If you just step back and take off your judges and lawyers hats and look at this from the person on the street whose – We're not supposed to do that. Well, no, but whose confidence – and that's the reason we have this refusal provision. If you think it might – the judge's impartiality might reasonably be questioned, I mean – You know, as a purely practical matter, there must be thousands of telephone calls by litigants' counsel at trial court level, whether it's bankruptcy court or the district court. Most of them, the district judge – I don't know about the bankruptcy judge. Most of them, the district judge hasn't a clue have occurred, because they're a call to a clerk that says something like, you know, when are we going to schedule a status conference, or has one been scheduled, do we want to get it changed, when can I file the – I mean, just all legion of questions that the judge never knows occurred. Right. It's just not going to happen that those go away. And they – And if a judge – if a trial judge, a district judge, or a bankruptcy judge does something different after that call has been made to one of that judge's staff, then you're saying the judge has an obligation to recuse. No. No. You're not saying that. No. And in this particular case, I'm looking now at the judge's order on page 7, and it cites all of the contacts. All but two were with the clerk. Just the very kind of thing that Judge Reimer was talking about. I mean, I understand, counsel, that you're concerned about, you know, how this may appear. The reality is that any time somebody is on the side of a lawsuit that they don't like, there is a conspiracy theory that comes around that somehow there is corruption involved. I think it's very bad for our legal system to have members of the bar suggesting, unless they've got some solid proof, that the judges are somehow corrupted. It's a very serious charge. And from my perspective, that's really what you're saying here, that this judge somehow got bought off or something and changed the ruling by which that judge was previously bound. As you've heard, and as you know, tenancy rulings are not binding. They are simply for the convenience of the attorneys. There is no evidence on this record of which I'm aware that suggests there was corrupt action or corrupt communication by this judge. Perhaps the judge would be wise not to let his clerk have so many expiry communications, and the judge should be very careful as well to avoid this appearance issue. But you've implied, both in the earlier case and in this case, at least what I'm hearing you say is, hey, judges, the real story here is we've got a corrupt judge. And I, for one, resent it. I think it's wrong. I don't think a member of the bar ought to be making these kinds of accusations unless you've got something solid. Well, Your Honor, I never said that. But you implied it. Well, it's the first thing that came to your mind. Well, you're just reinforcing what I said. It's the first thing that came to your mind. And I submit that when things like this happen, anyone who knows about it, the first thing is going to – I can't make that allegation because I don't have any evidence. Okay, Mr. Alloy, I think we understand the position. Thank you. Mr. Dahlberg. Good morning, Your Honor. John Dahlberg, Andrews Court Superior on behalf of the appellees. Both Benitoff, the individual, and – You're representing the trustee, right? No, Your Honor. I'm representing the Accenture Display Corporation. Sorry. Your Honor, I'll start – Which corporation? Accenture Display. Accenture Display. Yes. Okay. Who are the trust defendants in the adversary action and the defendants in the removed state court action. I'll start, I think, where the conversation ended up in the former argument, and that is dealing with the recusal motion. Just for the record, Your Honor, there was a sequence here as to how this got changed. The sequence was that there was a tentative decision before the first hearing on this. At that hearing, I argued with the judge, asked him to change that tentative hearing. He said he'd look at it, asked me to submit an order based on the tentative, which I said I would do, obviously. It was on the 18th. I hadn't submitted it. I'd left the hearing with the consciousness that he'd asked for it to come in quickly. I looked at the transcript. That was not true. That was my sense at the time. I usually do it the same day. I hadn't done it. I called. I said, I haven't done it. I'm not feeling well. I'll get it to you in due course. That's all that transpired. There was subsequently a call initiated by the judge through me, which was I think one of the only two times where the judge actually had a telephone contact with any of us outside the courtroom. And at that time, he said to me, A, I'm not going to talk about it until everybody's on the phone, and B, at that time, he told everybody what the tentative ruling was and gave them the opportunity to have a further hearing if they wanted it, which they did, and then we got to the third hearing, which is when the motion to recuse was heard and when all the summary judgment motions were also decided. The point about that sequence, Your Honor, is that when the judge actually dealt with the recusal motion, he said on the record, these are the reasons I've breached this decision. It was because argument was made to me. It was because I looked at these factors, and this is the result I got to, the point being that in the totality of the circumstances, there were independent, separate reasons for his decision, which I think takes care of any argument about his recusal. I would also like to turn, if I may, to the other part of this appeal, which is the affirmance by the district court and the grant by the bankruptcy court of the summary judgment motions in favor of my clients. In that regard, Your Honor, there were actually a number of reasons that I believe this court may be able to uphold these on the record. The first level, they're purely legal reasons. Both the district court and the bankruptcy court held as to some of the causes of action, two in each case, that these causes of action were purely the trustees' causes of action and that these plaintiffs and Metcalfs, as a result, did not have the standing to pursue them. Your Honor, I think that in both cases that was well-founded. The district court in particular cited Koch, which is a Second Circuit opinion. It also relied on folks, which is within the Ninth Circuit. Those cases, folks looked at California law, said that California law was controlling on these issues about whether these causes of action were poverty of the estate under 541 of the Code and, therefore, that the trustee exclusively had standing to bring them. Followed an analysis which distinguished between particularized injury and a general injury. In the latter case, it's the trustees' claim because it's an estate claim, the former case, the creditor may have standing to bring it. Applied it to the facts in this case, and, Your Honor, those facts were that the allegations were that there was a sale that was done essentially in defraud of the bankruptcy debtor. Those were assets that went out of the estate. They would have returned to the estate if it had happened. In other words, the only injury that was sustained by the Metcalfs was as a result of the property moving in and out of the estate. It was entirely derivative. It was not particularized. That in itself, I think, is basis for affirming on all of the causes of action. With no standing, we don't reach the merits, so there's no need to get there, right? That's absolutely the case, Your Honor. That's absolutely the case. As to the Metcalfs, sorry. Oh, I'm sorry. Was Metcalf the sole creditor? I beg your pardon? I didn't hear you. Was Metcalf the sole creditor? Of the estate? No, Your Honor, there were other creditors. Tell me who some of them were. Well, I'm not the trustee, so I didn't monitor the fact. But you're involved in this bankruptcy pretty heavily. In all frankness, Your Honor, as simply the purchaser of assets from the bankruptcy estate, I know there were others because I saw claims objections come across my desk, but I doubt whether I could identify them. And it really has not been within my bailiwick to do that. As to the merits, Your Honor, I think I've walked through fairly carefully in the brief the fact that under the standard, which requires them to at least show some evidence in support of a dispute of fact, there is no such evidence despite the judge allowing them the opportunity to do discovery on what was originally a motion to disperse the allegations of some kind of vast conspiracy to purchase these assets out of the bankruptcy for less than what they were worth. There was no evidence of any agreement in any of the deposition testimony. In fact, the evidence is to the contrary, that my client was approached from time to time by Mr. Wernerdahl. I'm sorry. I beg your pardon. Not by Mr. Wernerdahl, by Mr. Wernerdahl. I'm sorry. By Mr. Wernerdahl in an attempt to try and help out his failing company. My client consistently rejected that. There are allegations that my client talked about bankruptcy and had an agreement to put it in bankruptcy. In fact, the only thing that was said about bankruptcy was that there were other creditors who had thought of doing it and they had been advised through my client not to do it. And for those reasons, Your Honor, and for the other ones which I think are spelled out in the briefs and which I'm happy to go into in detail if you would like, I think that the evidence that was actually presented was not only failed to support the allegations that were made, but in many instances was contrary to them. And for those reasons, I've asked that you please put it in. Okay. Thank you, counsel, for your argument. Thank you. That argument has been submitted. We have the clerk.
judges: Rymer, Wardlaw, Smith